IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW CAMPOS,                          *
     Plaintiff

                            *     CIVIL ACTION NO. JKB-15-2800
  v.

                            *

ANDREW MOULTRIE, M.D.
OLADIPO OLALEYE,                        *
PATIENCE MUSONG,
ORLANDO JOHNSON,                        *
WARDEN LAURA ARMSTEAD,
TERA REED,                              *
DAMON FAYALL,[1]
     Defendants                         *
                           ******

**MEMORANDUM**

Pending is a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment filed on behalf of defendants Andrew Moultrie, M.D., and Damon Fayall, Medical Director. ECF 15.[2] Also pending is a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment filed on behalf of defendants Warden Laura Armstead, Chief of Security Orlando Johnson, and Lieutenant Tera Reed. ECF 18. Plaintiff has responded. ECF 23 & 26.[3] Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, the dispositive motions will be granted.

---

[1] Plaintiff's motion to amend (ECF 21) wherein he seeks to amend the names of defendants PA Dipo and RN Patience to reflect their correct names shall be granted. The Clerk shall amend the docket to reflect the correct names of all defendants, as set forth above.

[2] The motion is accompanied by a motion to seal plaintiff's medical records which are attached as an exhibit. ECF 16. The motion shall be granted.

[3] Defendants' motions for extension of time to respond to the complaint (ECF 12, 13, 14) shall be granted nunc pro tunc. Plaintiff's motions for extension of time to respond to the dispositive motions (ECF 20, 22, 24) shall be granted nunc pro tunc.

Background

A.     Campos's claims

On September 17, 2015, Andrew Campos, who is incarcerated at the Patuxent Institution ("Patuxent"), filed a self-represented civil rights complaint alleging that he was stabbed in his right hand and other areas of his body while incarcerated in the Hagerstown region which resulted in his suffering from nerve damage.  ECF 1, ¶¶13 & 14.  Plaintiff was transferred to Patuxent where he alleges "all of the treatment he was receiving stopped, delayed, or denied."  *Id*., ¶ 14. As a result of the cessation of his treatment, plaintiff claims he suffered additional injuries including a "head and knee" injury.  *Id.*

Plaintiff states that on March 3, 2015, while housed at Jessup Correctional Institution, his physical therapist wrote a note in his medical record indicating it was not advisable for plaintiff to be assigned a top bunk due to the instability in plaintiff's arm and hand.  *Id*., ¶ 16.  Plaintiff was evaluated by Oladipo Olaleye[4] on March 5, 2015, at Patuxent.  *Id*., ¶ 17.  Plaintiff advised Olaleye of the recommendation regarding his bunk status. Olaleye assured plaintiff he would be moved to the bottom bunk.  *Id.*

Several days later, plaintiff was advised by tier officers that he could no longer sleep on the floor.  He was told that if he was found sleeping on the floor he would be written up.  Plaintiff spoke to Lt. Reed and explained the situation.  He also filed an informal complaint indicating that he was being forced to get into the top bunk even though a medical request for bottom bunk status had been submitted.  *Id*., ¶18.  Plaintiff brought his concerns to Damon Fayall, Chief of Security Johnson, and Sgt. Pellot.  *Id*., ¶¶ 19  & 20.

---

[4] Plaintiff identifies Olaleye as "Dipo" in his complaint.  In his amended complaint (ECF 21) he provides the correct name for Olaleye.

Plaintiff states he was called to the medical department later that day where he was "hotly" confronted by Nurse Patience Musong who accused plaintiff of faking his injury to obtain medication. *Id.*, ¶ 21. Musong told plaintiff that she did not believe plaintiff needed physical therapy or bottom bunk status and would insure he did not receive same. *Id.* Shortly after this encounter, plaintiff was called for his chronic care appointment with the physician's assistant. Before he could explain his issues, Musong interrupted the appointment advising the other health care provider that plaintiff was lying about his injury and that there was nothing wrong with him. *Id.* Despite Musong's statements, the physician's assistant assured plaintiff he would be assigned to a bottom bunk and that his pain medication would be increased; however, this did not occur.

On March 15, 2015, Sgt. Pellot advised plaintiff that Musong had indicated there was no order for bottom bunk status and nothing was wrong with plaintiff. *Id.*, ¶22.

While attempting to climb into his bunk on March 18, 2015, plaintiff felt a sharp pain in both his hand and arm and lost his grip, falling backwards and banging his head and back on the cell desk and floor. *Id.*, ¶ 23. Plaintiff was seen by Olaleye on March 23, 2015, regarding this fall. He was continued on his regular medication, despite complaining of severe headaches and dizzy spells. He was offered no explanation for why he had not been transferred to the bottom bunk. *Id.*, ¶ 24. When plaintiff returned to his tier, a correctional officer called Olaleye, who confirmed that plaintiff was to be assigned to a bottom bunk. He was reassigned to a lower bunk that day. *Id.*, ¶ 25.

Plaintiff indicates that he filed an administrative remedy procedure complaint regarding his fall and ineffective treatment by medical and custodial staff on March 25, 2015. *Id.*, ¶ 26. Warden Armstead dismissed the complaint on April 2, 2015, finding that medical staff had

provided plaintiff with a bottom bunk order, which had been forwarded to custody staff. Plaintiff appealed the dismissal. *Id.*

Plaintiff was seen by Dr. Moultrie in the chronic care clinic on June 12, 2015. He advised the doctor that he was still experiencing severe pain, which he attributed to the nerve damage as well as back pain from the fall. Plaintiff advised Moultrie that the medication did not alleviate his pain. Plaintiff was advised that his dose would be increased, but it was not. *Id.*, ¶ 28.

On June 17, 2015, plaintiff was moved to an upper bunk. He was advised that Sgt. Rolling ordered the move "per medical." *Id.*, ¶ 29. On June 30, 2015, plaintiff advised Olaleye that he had been moved to an upper bunk. Olaleye indicated he would submit a new bottom bunk order. *Id.* ¶ 30. Plaintiff states that on July 10, 2015, he again fell off the top bunk. *Id.*, ¶ 31.

On July 17, 2015, Olaleye refused to examine plaintiff stating he was tired of dealing with plaintiff's issues and there was nothing more that he was willing to do for plaintiff. *Id.*, ¶ 32.

On July 29, 2015, Musong began crushing plaintiff's pain medication (Neurontin). When plaintiff asked why, she replied, "you think you have power because you write ARPs, I'm now showing you my power." Plaintiff states that he understood Musong's comment to "be interference to me writing up the fall that happen on 6-30-15." *Id.*, ¶ 33.

Plaintiff advised Musong on July 31, 2015, during morning medication distribution, that he was experiencing diarrhea, stomach aches, and vomiting whenever he took his muscle relaxer, and that he did not want to take that medication until he met with the doctor. Musong "became enraged" and said she was not going to play games and handed plaintiff a medication refusal form that was blank and that she directed plaintiff to sign. Plaintiff refused to sign the form, taking it to fill out himself. Musong snatched the pen from plaintiff's hand causing a sharp pain. Plaintiff notes he wrote an ARP regarding this incident. *Id.*, ¶ 34.

Plaintiff met with Olaleye and Moultrie on August 3, 2015, regarding the result of an x-ray. He was advised that the results were benign and that he would be contacted regarding further testing.  Plaintiff asked why his morning dose of Neurontin had been discontinued and was told that Musong indicated that plaintiff no longer wanted the medication. Plaintiff stated that he told Moultrie that he never missed a dose and that Musong was intentionally tampering with his medication in retaliation against him.  *Id*., ¶ 35.

Plaintiff states that on August 4 and 13, 2015, he was seen at sick call regarding the severity of his pain.  He advised the medical providers that he was not getting any relief.  *Id*., ¶¶36 & 37.  Plaintiff states he requested Moultrie restart his morning dose of Neurontin but Moultrie advised that it would not be restarted since plaintiff likes to complain.  *Id*., ¶¶36 & 38.  Moultrie also advised plaintiff that he intended to set up a tele-conference with "the head of doctors" to address the result of plaintiff's x-rays and symptoms.  *Id*., ¶36.  Since then, plaintiff alleges his medical requests and complaints are ignored.  *Id*., ¶39.

B.      Medical Care

Plaintiff's relevant medical history is of chronic pain associated with a stabbing to his left upper extremity.  ECF 16-2.  He also has a self-reported history of head and lower extremity trauma after being hit by a vehicle prior to his incarceration as well as a self-reported history of sickle-cell trait with intermittent pain in the bone, knee, and leg.  *Id*., pp. 2, 9.

On April 2, 2014, plaintiff was evaluated following a fight with other inmates.  *Id*., pp. 11-12.  Plaintiff reported a "stab wound to his left arm."  Two superficial puncture marks 1 cm round x 0.5 cm to his left forearm were noted as well as a superficial scratch to his left breast, and scrapes on his right hand pointer finger and middle finger knuckles.   Slight edema but no

discoloration was noted. Plaintiff had full range of motion.  His wounds were cleaned and dressing applied. *Id.*

Plaintiff was examined on April 9, 2014, during a scheduled sick call for complaints regarding his left hand/forearm wound, headaches, and pain in his right hand.  *Id.*, pp. 14-15. Plaintiff reported being injured during an altercation the preceding week.  *Id.*, pp. 16-18. Plaintiff's right hand was tender to touch, discolored, and swollen.  He reported having pain with movement and his range of motion was limited.  He also reported he was unable to bend the fingers of his right hand.  *Id.*  Plaintiff's middle knuckle was bruised and healing abrasions were observed.  No signs of infection were noted.  The wounds were cleaned with antiseptic, soap, water, and normal saline, and an antibiotic ointment was applied.  *Id.*, p. 18.  Plaintiff was directed to apply a cold compress to the affected area, and he was prescribed ibuprofen.  He was referred to a provider to rule out a fracture to his hand.  *Id.*, p. 15.

Plaintiff was examined by the physician on April 14, 2014.  *Id.*, p. 21.  Minimal edematous of the dorsum of the right hand was observed; however, the right hand remained tender to palpation.  Plaintiff exhibited decreased range of motion in his right wrist and fingers. He reported not receiving pain medication, and ibuprofen was prescribed.  An x-ray was also ordered.  *Id.*  The x-rays showed no acute fractures, dislocation, or subluxation.  Plaintiff's carpal bones were intact and his alignment was anatomical.  *Id.*, p. 225.  Plaintiff was advised of the result of the x-ray on April 21, 2014.  *Id.*, pp. 26-27.  At that time, plaintiff reported that the ibuprofen was helping but he had to double the dose in order to get significant relief, resulting in an upset stomach.  Plaintiff was prescribed 800 mg of Motrin and Zantac to address his gastro-intestinal reaction.  *Id.*

Plaintiff was again seen on May 14, 2014, due to continued complaints of pain in his hand. *Id*., pp. 30-34. He reported his pain had worsened and described it as throbbing and shooting when awake. He reported no benefit from the ibuprofen. Plaintiff was unable to fully flex and extend his fingers. He was instructed to apply a cold compress to the affected area and to decrease use of his right hand. He was referred for further follow up. *Id*. Plaintiff was seen by a physician's assistant on May 23, 2014. *Id*., pp. 35-36. Plaintiff reported throbbing pain in his first three fingers and a tingling pain with "pin and needle" sensation. He rated the pain as an eight on a scale of ten. He reported increased pain when he was lying on his hand, writing, or engaging in other fine dexterity tasks, and when handcuffed. Plaintiff was prescribed Amitriptyline or Elavil (an anti-depressant which also treats nerve related injuries) as the physician's assistant believed his pain was nerve related arising from the stabbing. *Id*.

Plaintiff was evaluated on June 5, 2014, for an unrelated matter. *Id*., pp. 39-42. At that time he reported difficulty flexing his index and middle fingers of his right hand and reported pain with flexion and fist formation. *Id*., p. 40. Plaintiff had moderate pain with motion; swelling of the right hand was noted. The physician also noted swelling in plaintiff's right index and middle fingers. The physician noted the metacarpal head of the right ring finger was absent when she reviewed plaintiff's x-rays. She concluded that the pain was possibly related to an old "boxer fracture" of plaintiff's fourth metacarpal. *Id*. Plaintiff was prescribed a Medrol dose pack (a steroid that prevents the release of substances in the body that cause inflammation) to reduce swelling and to be taken in conjunction with his prescribed Amitriptyline. *Id*.

On June 9, 2014, plaintiff reported to Dr. Rohrer that he was not compliant with his medication because it made him sleepy and not alert to defend himself from another attack. *Id*.,

p. 45.   Plaintiff's medications were discussed with him and plaintiff's non-compliance with prescribed medication was noted. *Id.*

Plaintiff was seen by the physician's assistant on June 13, 2014. *Id.*, pp. 48-49.  Moderate pain with motion was observed.  Plaintiff reported that the Amitriptyline was not effective and complained that it was sedating.  As such, plaintiff was prescribed Gabepentin (Neurontin) (used to relieve nerve pain in adults).  Multiple scars on plaintiff's arms, head, and chest secondary to what appeared to be old stab injuries were observed. *Id.*

On July 17, 2014, plaintiff reported pain relief with Elavil and Neurontin but requested an increase in the Neurontin dose as he found the relief short lived.  Dr. Stallworth recommended continuation of plaintiff's medication without adjustment. *Id.*, pp. 52-53.  Plaintiff was evaluated again on August 14, 2014, due to complaints of neck pain. *Id.*, p. 59.  His medications were continued. *Id.*

On October 2, 2014, during a scheduled provider visit for unrelated medical issues, plaintiff complained of left arm and shoulder pain that was relieved by Elavil and Neurontin; however, plaintiff stated that the medication wore off "too soon." *Id.*, p. 65.  Examination revealed no tenderness or atrophy in his upper extremity and full range of motion.  His medication regimen was continued unchanged. *Id.*  On October 11, 2014, during a provider visit for an unrelated health matter, plaintiff again reported pain relief using Elavil and Neurontin but again requested an increase in Neurontin because the dose "relieves until it is essentially time for the next dose." *Id.*, p. 67.  Plaintiff's Elavil was increased from 10 mg to 25 mg and plaintiff was prescribed Indocin (a non-steroidal anti-inflammatory that reduces hormones that cause inflammation and pain) to be taken three times daily. *Id.*, pp. 70-71.

Plaintiff was seen on December 3, 2014, after accidentally being hit in his mouth when his cell door opened.  *Id.*, pp. 76-78.  Plaintiff suffered a 1.5 cm laceration to his mouth, which was cleaned and five sutures applied.  *Id.*  He was next seen on December 9, 2014, when he complained of dizziness, blurred vision, and "pain in his head."  *Id.*, p. 82.  Plaintiff was approved to be taken to the emergency room for evaluation of his head, but he refused.  *Id.*, p. 85.  His sutures were removed on December 11, 2014.  *Id.*, p. 86.

During examination on December 23, 2014, it was noted that plaintiff continued to exhibit weakness in his right 4th and 5th fingers and had difficulty flexing or extending those digits.  *Id.*, pp. 88-90.  Plaintiff also reported that the relief provided by his pain medication was short lived.  His Neurontin prescription was increased.  Additionally, a consult was placed for physical therapy, which was approved.  *Id.*

Plaintiff was evaluated by the physical therapist on January 20, 2015.  *Id.*, p. 217.  Normal active and passive range of motion in both upper extremities was observed, with the exception of the fourth and fifth digits of plaintiff's right hand.  *Id.*  Plaintiff demonstrated normal strength in his right and left upper extremities with the exception of his right wrist flexion and finger flexion of the fourth and fifth digits.  No physical therapy was deemed necessary for the left upper extremity.  Physical therapy and a home exercise regime were recommended to increase plaintiff's right hand strength and range of motion.  Additionally, plaintiff was recommended to perform scar mobilizations twice a week for three weeks.  *Id.*

Plaintiff did not receive his Neurontin on January 27, 2015, because he was observed throwing away the prescription.  *Id.*, p. 296.  On that same day, he was evaluated by the physical therapist.  *Id.*, p. 219.  Plaintiff's right hand range of motion had improved and he reported feeling better. Additionally, physical therapy was recommended.  *Id.*  Plaintiff was again evaluated by the

physical therapist on January 29, 2015.  *Id*., p. 220.  His range of motion had improved and he again reported feeling better. Physical therapy was recommended for one time a week.  *Id.*

Plaintiff submitted a sick call slip on February 8, 2015, complaining of headaches and blurred vision but failed to appear for evaluation.  *Id*., p. 191.

Plaintiff was evaluated by the physical therapist on February 10, 2015. *Id*., p. 222.  His left upper extremity was assessed as 95% functional.  Plaintiff reported feeling better and it was recommended he continue physical therapy.  On that same day, plaintiff was seen by Ayo Jimoh, R.N., for post physical therapy assessment, which revealed that plaintiff's right arm was within normal limits and no apparent evidence of acute discomfort was observed.  *Id*., p. 94.

Plaintiff was seen by Oladipo Olaleye, R.N.P., on February 17, 2015, due to complaint of headache due to plaintiff's having his cell door slammed on his face in December of 2014.  ECF 18-7, pp. 53, 79.  Olaleye noted that the pain was at the occipital lobe.  *Id.*

On March 3, 2015, during a physical therapy consult, plaintiff reported pain in his left arm and alleged that he experienced difficulty climbing onto the top bunk.  ECF 16-2**,** p. 222.  Examination demonstrated that plaintiff's left upper extremity range of motion was strong and within normal limits; however, it was recommended that plaintiff receive one additional therapy visit before discharge.  Additionally, physical therapist Constabile requested a bottom bunk assignment for plaintiff due to his self-reported issues regarding getting on to the top bunk.  *Id.*

Oladipo Olaleye, R.N.P., met with plaintiff on March 9, 2015, due to plaintiff's complaints that he was suffering headaches and had not received a bottom bunk assignment.  *Id*., pp. 95-96.  Plaintiff indicated that noise and light exacerbated his headaches.  *Id*., p. 95.  At that time, plaintiff was receiving Excedrin for migraines.  *Id*., p. 96.  A neurological exam demonstrated that plaintiff's sensation, reflexes, and motors were intact other than weakness in

plaintiff's right fingers.  *Id.*, p. 95.  Plaintiff's prescription for Excedrin was continued and he was issued a three month bottom bunk slip.  *Id.*, p. 95, 235.

Plaintiff was seen by physical therapist Constabile on March 10, 2015.  At that time, his range of motion and strength had improved.  His hand and wrist's passive range of motion were within normal limits.  Plaintiff reported feeling better and that he experienced no pain while taking his medications.  Accordingly, his physical therapy was discontinued.  *Id.*, p. 223.

On March 13, 2015, plaintiff was evaluated by Dr. Andrew Moultrie due to unrelated concerns.  *Id.*, p. 97.  During the visit, plaintiff complained of pain and weakness in his left forearm and right hand and limited movement in both extremities.  *Id.*, p. 98.  Plaintiff reported having positive pain relief but not complete elimination of pain.  An objective assessment showed plaintiff had diminished grip and that he reported altered sensation in his left and right hands.  Moultrie discussed plaintiff's non-compliance with his medication, and plaintiff indicated his understanding that compliance was necessary.  Plaintiff's medication was continued.  *Id.*

Plaintiff submitted a sick call slip on March 19, 2015, alleging he fell while climbing onto his bunk and advising medical staff that he had not received his lower bunk assignment.  *Id.*, p. 194.  In response to the sick call slip, on March 23, 2015, a second medical form for bottom bunk status was submitted on plaintiff's behalf.  *Id.*, p. 236.

Plaintiff was seen on March 26, 2016, by Dr. Robert Maman, for a psychiatric medication review.  *Id.*, pp. 101-104.  Plaintiff did not offer any complaints relative to his alleged injuries from the stabbing or fall.  *Id.*  Dr. Maman again met with plaintiff on May 14, 2015, for psychiatric medication management.  *Id.*, p. 105.  At that time, plaintiff complained of hearing voices and paranoia.  He was also experiencing persecutory delusions.  He made no mention of any symptoms relative to the stabbing or fall.  *Id.*  After group therapy on May 21, 2015, plaintiff

asked to speak privately with Caron Casciato, Psy. D.  *Id*., p. 109.  Plaintiff expressed ongoing difficulties with sleeplessness, anxiety, and irritability.  He raised no complaints regarding pain or untreated medical issues.  *Id*.

Plaintiff was not seen again in the medical department until June 12, 2015, when he was evaluated by Dr. Moultrie, during a chronic care visit.  *Id*. pp.. 110-112.  Plaintiff complained regarding pain in his right shoulder, lower back, and occipital pain.  He also reported the medication did not help with his back pain.  Review of plaintiff's medication records showed that plaintiff had not been compliant with taking his prescribed Neurontin.  *Id*.  Examination revealed tenderness to palpation at the L2-L3 level of the spine and bilateral lumbar spasm.  Plaintiff's left forearm demonstrated pain on palpation with diminished grip strength.  Tenderness was noted in the occipital area and cervical spine.  Plaintiff's range of motion in his neck was normal as was his right hand strength.  Plaintiff reported numbness in the fourth and fifth digits of the right hand. Moultrie advised plaintiff on the importance of his complying with his medication regimen and that he needed to take all medication as prescribed.  Plaintiff's medications were continued with the addition of Robaxin.  *Id*.  Moultrie also ordered x-rays of plaintiff's cervical and lumbar spine, which revealed normal cervical and lumbar lordosis.  *Id*., p. 226.  No evidence of an acute fracture, dislocation, or subluxation was found.  Nor was any paravertebral soft tissue swelling observed.  *Id*.

Plaintiff was evaluated by Oladipo Olaleye, R.N.P., on June 30, 2015, for complaints regarding a fungal rash on plaintiff's foot and toes.  *Id*., pp. 117-118.  Plaintiff did not offer any complaints regarding his injuries arising from the stabbing incident or fall during the encounter. Plaintiff's bottom bunk assignment was renewed for three months.  *Id*., p. 117.

On July 10, 2015 at approximately 3:14 p.m., Ayo Jimoh, R.N., B.S.N., evaluated plaintiff due to his complaint of lower back pain after plaintiff reported he fell from the top bunk. *Id*. p. 124. Examination revealed no evidence of acute injury; no swelling; no bruising; no redness; and no bleeding. *Id.* Plaintiff was prescribed 400 mg of Motrin and referred to the nurse practitioner, who evaluated him that same day. *Id*., pp. 124, 127. Oladipo Olaleye, R.N.P.'s examination of plaintiff, at approximately 4:24 p.m., revealed good range of motion in all extremities but pain at the lower back. He was advised to take the ibuprofen as needed. *Id*., p. 127.

Olaleye evaluated plaintiff again on July 17, 2015, during a provider sick call for back pain, headaches, and dizziness. *Id*., p. 128. Small swelling was observed on plaintiff's posterior head area; however, he remained alert and oriented. Plaintiff's medications were reviewed, and he was advised to rise gently from a sitting position and to apply a warm compress to his head. *Id*., pp. 128-129. Olaleye evaluated plaintiff again on July 17, 2015, due to continued complaints of back pain, headaches, and dizziness. *Id*., pp. 130-131. It was noted that plaintiff alleged he fell on or about July 9, 2015, but there were no witnesses to the event. The Romberg neurological examination was negative, indicating plaintiff's neurological processes were intact. *Id*. Plaintiff's medical records were reviewed, and they showed plaintiff was non-compliant with his pain medications, specifically Neurontin. Plaintiff was reminded of the importance of complying with his medication and treatment and to use warm compresses. Plaintiff advised Olaleye that he was observing Ramadan and thus for religious reasons was noncompliant with his medication. X-rays of plaintiff's skull and lumbosacral spine were ordered. *Id*., p. 131. The x-rays of plaintiff's skull showed no acute fracture, dislocation, or subluxation. His alignment was anatomical and no abnormalities were identified. A benign bony protuberance on plaintiff's skull was noted. *Id*., p. 228. The x-rays of plaintiff's lumbar spine revealed no evidence of an acute fracture, dislocation,

or subluxation.  The vertebral body heights were normal as well as the distance between plaintiff's vertebrates.  The lumbar lordosis maintained a normal curvature and there was no evidence of acute disease of the spine.  *Id.*

Dr. Moultrie also examined plaintiff that day.  *Id.*, pp. 132-33**.**  No sign of bruising on plaintiff's back, neck, or shoulders was observed.  *Id.*, p. 132.  Plaintiff's spine was positive for posterior tenderness and bilateral tenderness of the lumbar spine. Plaintiff declined to be evaluated for flexion and extension.  Plaintiff's right knee had tenderness and mild pain with motion.  *Id.*, p. 133.  Plaintiff's neurological assessment revealed he was alert and oriented.  His cranial nerves II-XII were grossly intact.  Plaintiff was instructed to use a heat compress.  He was prescribed Ibuprofen 600 mg and Robaxin (a muscle relaxer) for pain relief.  *Id.*  Review of plaintiff's records by Moultrie showed plaintiff's non-compliance with his medication regimen. *Id.*, p. 132.  Plaintiff was reminded of the importance of complying with his medication and treatment plan.  *Id.*, p. 133.  Moultrie consulted with Olaleye and noted that NSAIDs, heat, muscle relaxants, and x-rays were recommended.  *Id.*

Plaintiff submitted a sick call slip on July 30, 2015, complaining of pain and indicating he no longer wished to take his prescribed muscle relaxers.  *Id.*, p. 201.  He was evaluated by Olaleye on August 4, 2015.  Plaintiff complained of back pain, headaches, and dizziness.  *Id.*, pp. 137-138.  Plaintiff's neurological exam was unremarkable.  The Romberg neurological test was negative.  Plaintiff was alert and oriented.  *Id.*, p. 137.  A musculoskeletal examination demonstrated normal musculature; no skeletal tenderness or joint deformities were observed.  *Id.* Plaintiff's prescription for Robaxin was discontinued due to plaintiff's complaints of dizziness. *Id.*, p. 234.  The Neurontin prescription was continued; however, due to plaintiff's non-compliance with the taking of his morning dose, his prescription was changed to once daily.

Plaintiff was reminded of the importance of compliance with the directions regarding medication and advised that it was recorded that he was non-compliant with his medication resulting in a request that he be carefully monitored over the next six weeks for compliance.  *Id*.

Plaintiff was evaluated by Ayo Jimoh, R.N.C., B.S.N., on August 13, 2015, for complaints of arm pain, headaches, blurred vision, and dizziness.  *Id*., p. 139.  Plaintiff expressed concerns regarding changes to his Neurontin prescription from twice daily to once daily.  Jimoh noted plaintiff was prescribed Neurontin 800 mg. nightly and Naprosyn 500 mg twice daily.  Plaintiff was referred for a tele-medicine conference on August 15, 2015.  *Id*.

Plaintiff submitted sick call slips on August 18 and 25, 2015, complaining of pain; however, he failed to appear for evaluation.  *Id*., pp. 204-205.

On September 2, 2015, plaintiff was evaluated by Olaleye due to complaints of back pain, headaches, and blurry vision.  *Id*., pp. 140-141.  Plaintiff's Neurontin prescription was increased to twice daily.  He was again advised of the importance of complying with his medication regimen.  *Id*., p. 140.  It was noted that if plaintiff's complaints of headache and blurred vision continued, a CT scan would be recommended.  *Id*.  Plaintiff's neurological exam was intact.  A small amount of swelling to the occipital lobe was noted.  Plaintiff complained of pain of 7 out of 10.  *Id*.  X-rays of the skull revealed a bony knot at the occipital lobe.  *Id*.

Plaintiff had a telemedicine conference with the Regional Medical Director on September 9, 2015.  *Id*., pp. 142-143.  It was agreed that plaintiff would undergo a CT scan for complaints of blurry vision, facial twitching, and headaches.  *Id*., p. 143.

Plaintiff was evaluated by Dr. Moultrie on September 11, 2015, in the chronic care clinic for unrelated concerns.  *Id*., pp. 144-146.  Examination showed tenderness of plaintiff's right anterior deltoid with moderately reduced range of motion.  *Id*., p. 145.  No crepitus was observed.

No movement above horizontal was noted and plaintiff's internal rotation was limited.  Moultrie again discussed plaintiff's non-compliance with his pain medication regimen.  Plaintiff voiced his understanding.  Plaintiff complained of dizziness for the previous 2-3 months as well as right cheek twitching for the previous 2-3 weeks and stated he had suffered three falls since March.  *Id.* He was advised to follow up if his condition worsened or if there was no improvement within thirty days.  *Id.*, p. 146.

On September 26, 2015, plaintiff submitted a sick call slip complaining of pain but failed to appear for his evaluation.  *Id.*, p. 207.

Plaintiff's CT scan was interpreted on September 29, 2015.  *Id.*, p. 229.  The scan of his head was normal.  *Id.*  Additionally, plaintiff was seen by registered nurse Ayo Jimoh on that day. She noted no apparent distress or discomfort in plaintiff, and plaintiff was discharged to his cell in stable condition.  ECF 18-7, p. 6,

Olaleye met with plaintiff on October 5, 2015, concerning plaintiff's failure to come for his morning medication several times in September. ECF 16-2, pp. 152-153.  He was again educated regarding the importance of compliance with medication and he promised he would comply with his medication regimen in October.  Examination of plaintiff's head and skull was normal. Plaintiff denied any medical problems.  *Id.*, p. 153.

Plaintiff was seen by Olaleye on November 16, 2015.  Plaintiff was informed that the CT scan of his head was normal. Plaintiff insisted he could feel swelling to the occipital lobe. Olaleye examined plaintiff's head and no swelling was present.  ECF 18-7, p. 2**.**

On November 30, 2015, Dr. Moultrie submitted a non-formulary request for approval of a 90-day prescription of Neurontin 800 mg, three times a day.  ECF 16-2, pp. 162-163**.**

Plaintiff was evaluated in the chronic care clinic on December 11, 2015, for plaintiff's respiratory conditions.  *Id.*, p. 166.  Plaintiff raised no complaint at that time regarding upper extremity pain, headaches, dizziness, or blurred vision.  His pain medication was continued, including Neurontin, Naprosyn, and Amitriptyline.  *Id.*

Plaintiff continues to be non-compliant with his medication regimen.  ECF 15-5, ¶ 54. Plaintiff failed to appear to take his morning dose of Neurontin on January 1, 2, 5, 6, 8-11, 18, 22, 25, and 30, 2016, and failed to take his afternoon dose of Neurontin on January 1, 3-6, 9-11, 13, 20, 21, 27, and 28, 2016.  *Id.*  Plaintiff is regularly seen by medical staff as a chronic care patient and may be seen more immediately if he needs through the sick call process.  *Id.*

Dr. Moultrie avers that plaintiff's pain medications have been prescribed based on clinical judgment as to what is medically appropriate for plaintiff's pain needs.  *Id.*, ¶ 56.  He indicates that neither he, nor any other provider, reduced plaintiff's dosage or discontinued plaintiff's medication as punishment or in retaliation against plaintiff.  *Id.*  Further, Dr. Moultrie avers that at no time has Damon Fayall been directly involved in the delivery of medical care to plaintiff, in the prescription of pain medication for plaintiff, or in the assessment of whether plaintiff requires bottom bunk assignment.  *Id.*, ¶ 59.

C.     Bottom Bunk Status

To receive bottom bunk status, an inmate must place a sick call request seeking bottom bunk status.  ECF 18-3, ¶ 5.  The inmate will be evaluated by medical staff who will determine if there is a medical need for a bottom bunk.  If there is a medical need for a bottom bunk, medical personnel will issue the bottom bunk order and send same by institutional mail, or by hand delivery, to the traffic department.  *Id.*, ¶¶ 4-5.  Once the traffic department receives the order, they change the housing status of the inmate and move the inmate as soon as possible.  *Id.*, ¶ 5.

Plaintiff was issued a bottom bunk order on March 9, 2015.  *Id.*, ¶ 4.  Plaintiff was not moved to a bottom bunk until March 23, 2015, however, because the March 9, 2015, order was not received by the traffic department.  *Id.*  The traffic department did receive the March 23, 2015, order.  Plaintiff was assigned to a bottom bunk from March 23, 2015, to June 18, 2015, when plaintiff left for a medical appointment.  *Id.*, ¶ 7.  When plaintiff returned from his medical appointment on July 1, 2015, he was erroneously assigned to a top bunk.  *Id.*  He was moved to a lower bunk on July 10, 2015.  *Id.*

Lieutenant Tera Reed avers that she does not recall speaking to plaintiff on or about March 5, 2015, regarding his being placed on bottom bunk status.  ECF 18-4, ¶ 4.  Reed avers that if plaintiff, or any other inmate, approached her about his bunk status, she would refer him to the medical department.  *Id.* Reed also avers that had plaintiff given her an informal complaint, she would have given the complaint to the inmate grievance officer.  *Id.*

Security Chief Orlando Johnson avers that he does not recall plaintiff approaching him on March 13, 2015, regarding his bunk status.  ECF 18-5, ¶ 4.  Johnson also does not recall referring plaintiff to Sergeant Pellot.  *Id.*  Johnson states that if plaintiff had come to him regarding his bunk status, he would have referred him to the medical department.  *Id.*

Defendants offer that when an inmate claims to be injured, the inmate is seen by the medical department as soon as possible and a notation is placed in the unit log book documenting the incident.  ECF 18-3, ¶ 6.  Additionally, the supervisor or shift commander completes an incident report.  *Id.*  Where there is a severe injury, the tier officer will call a medical alert and the inmate will be transported to the medical department by custody and medical staff.  *Id.*

The log book for plaintiff's unit does not contain a notation on March 19, 2015, that plaintiff fell from his bunk.  *Id.*  The first record of the fall is on March 23, 2015, when plaintiff

went to the medical department after filing a sick call slip.  At that time, plaintiff expressed to the physician that he had fallen four days prior when attempting to climb into his bed.  On March 19, 2015, Correctional Officer Whitney Davis was working the E1 tier, where plaintiff was housed. ECF 18-6, ¶ 4.  Davis does not recall plaintiff informing her that he fell from his bunk.  If plaintiff had advised Davis he fell from his bunk, Davis would have contacted a supervisor and the medical department.  *Id*.

The log book notes reflect that on July 10, 2015, at approximately 2:30 p.m., Lieutenant Taylor instructed Officer Dada to call to have plaintiff escorted to medical due to plaintiff's having fallen and having hurt his back.  ECF 18-3, ¶ 6.

D.      Administrative Remedies

Plaintiff submitted administrative remedy procedure form (ARP) 0159-15 on March 27, 2015.  *Id*., pp. 14-16.  In his ARP, plaintiff complained that several days after his March 5, 2015, appointment with the physician's assistant who completed a bottom bunk status form, plaintiff had not been assigned a bottom bunk.  *Id*.  Plaintiff stated he submitted an informal complaint to Lt. Reed but had not received a response.  Additionally, he stated that on March 13 he was confronted by "Nurse Patience" who accused him of lying about his arm.  *Id*.  Plaintiff also claimed that he followed up with Sgt. Pellot on March 15 regarding his bottom bunk status; however, Pellot advised that he spoke to Nurse Patience who relayed that there was no record in plaintiff's file that he had been granted bottom bunk status.  *Id*.  Plaintiff complained that on March 18 he fell off his bunk attempting to climb onto the top bunk.  *Id*.

On April 2, 2015, plaintiff's ARP was dismissed after an investigation revealed that the nurse practitioner did give plaintiff a bottom bunk form, which was forwarded to the appropriate custody staff.  Additionally, there was no evidence of any encounter involving a nurse.  *Id*., pp. 5-

13.  Plaintiff filed an appeal to the Commissioner of Corrections on April 14, 2015.  *Id.*, pp. 25-26.  On July 2, 2015, the investigation was concluded and plaintiff's appeal was found to be meritorious.  The response stated that custody had been directed to follow all medical orders in their entirety.  *Id.*, p. 27.

Plaintiff filed Inmate Grievance Office (IGO) 20150976 as an appeal of ARP 0159-15, complaining of medical issues from a previous stabbing, not being provided bottom bunk status, and being denied physical therapy.  ECF 18-8, ¶¶ 5-6.  On July 6, 2015, a letter was sent to plaintiff from the IGO requesting copies of documents demonstrating exhaustion as well as medical records supporting his claim.  *Id.*, ¶ 7.  The grievance was administratively dismissed as moot because plaintiff was moved to a bottom bunk on March 23, 2015.  *Id.*

Plaintiff filed ARP 0490-15 on July 15, 2015, complaining that on July 11, 2015, he advised the unit officer that he was experiencing pain from a fall on July 10, 2015, and that he did not receive his medication.  He alleged that the officer stated that he called the medical department but the medical department said it was too late for plaintiff to be seen or given medication.  ECF 18-3 pp. 34-35.  The ARP was dismissed for procedural reasons pending resubmission.  *Id.*, p. 34.

Plaintiff submitted ARP 0506-15 on July 16, 2015, complaining that on June 17, 2015, he was moved to a different cell and the correctional officer told him that the traffic department controls movement and that he must address his bottom bunk status issues to the traffic department and medical department.  *Id.*, p. 36.  The ARP was dismissed for procedural reasons pending resubmission.  *Id.*

Standard of Review

A.    Motion to Dismiss

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-62 (2007) (retiring old standard from *Conley v. Gibson*, 355 U.S. 41 (1957)). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 562. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusional factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

In reviewing the complaint in light of a motion to dismiss pursuant to Rule 12(b)(6), the court accepts all well-pleaded factual allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* A complaint need only state "enough facts to state a claim to relief that is plausible on its face." *Id*. 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

B.      Motion for Summary Judgment

Summary judgment is governed by Rule 56(a), which provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)).

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson*, the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  477 U.S. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact.  No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *See Catrett*, 477 U.S. at 322-23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Analysis

A.     Respondeat Superior

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Additionally, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*.  *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Plaintiff's claims against Warden Laura Armstead and Medical Director Damon Fayall, supervisors who had no personal involvement in plaintiff's treatment or bunk assignment, are insufficient.  Plaintiff has pointed to no action or inaction on the part of Warden Laura Armstead

and Medical Director Damon Fayall that resulted in a constitutional injury, and accordingly, his claims against Warden Laura Armstead and Medical Director Damon Fayall shall be dismissed.

C.     Medical Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).   Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).   Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40.   "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).   "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison

officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844).   If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted.  *See Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."  *Johnson v. Quinones* 145 F.3d 164, 166 (4th Cir. 1998).  Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present.  *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness.  *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).  "Deliberate indifference may be demonstrated by either actual intent or reckless disregard."  *Miltier*, 896 F.2d at 851.  Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms.  *Quinones*, 145 F.3d at 168.  Mere negligence or malpractice does not rise to a constitutional level.  *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).

26

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977).   The record evidence indicates that, during the relevant time, medical staff considered plaintiff's requests for medical care and his needs were addressed.  Plaintiff's claim that his medical case stopped when he was transferred to Patuxent is belied by the records, which demonstrate that he was seen regularly by medical personnel and provided medical care including medication, x-rays, neurological exams, a CT scan, physical therapy, and counselling.  On the occasions that plaintiff reported that his pain medication was insufficient, his medication was adjusted to alleviate his concerns.  Despite his being regularly treated by medical staff and their instructing him on the importance of his following his medication protocol, plaintiff was regularly non-compliant.[5]  In regard to plaintiff's assignment to a bottom bunk, medical staff issued bottom bunk assignments when they deemed them medically necessary.  Medical defendants indicate that both orders for bottom bunk status were relayed to custody staff.  When plaintiff reported the bottom bunk assignment was not being provided, medical staff contacted correctional staff on plaintiff's behalf.  Medical staff are not responsible for housing and bunk assignments.

Rather than medical defendants being deliberately indifferent to plaintiff's serious medical needs, it was plaintiff who was noncompliant with his medication protocol.  Plaintiff's belief that he was entitled to some other care than that provided by medical staff is nothing more than a disagreement over the treatment provided.  "Disagreements between an inmate and a physician

---

[5] Plaintiff disputes that he was noncompliant with his medication.  ECF 23-1.  Plaintiff indicates that the only times he encountered difficulties with his medication were in the morning when Musong was working.  He states that had he thrown out his medication or otherwise tampered with same, he would have received an institutional rule violation.  The record evidence demonstrates that plaintiff not only missed morning doses, when he alleges Musong was working, but evening doses as well.  The evidence also demonstrates that plaintiff was repeatedly non-compliant with a variety of medications, not solely his morning Neurontin dose.

over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970)). There are no exceptional circumstances alleged in this case. Andrew Moultrie, M.D., is therefore entitled to summary judgment. Had defendants Oladipo Olaleye and Patience Musong been properly served with the complaint, they would likewise be entitled to summary judgment.

Likewise, there is no evidence that correctional staff were deliberately indifferent to plaintiff's medical needs. While the medical department completed bottom bunk orders on March 9, 2015, and March 23, 2015, the traffic department did not receive notice of the orders until March 23, 2015, which was after plaintiff's March 19, 2015, fall. Additionally, plaintiff did not submit an ARP regarding his bottom bunk status until March 27, 2015. Defendants Reed and Johnson aver that they do not recall plaintiff discussing his bunk status with them in early March.

Plaintiff's bottom bunk order was renewed by medical staff on June 30, 2015. Plaintiff was assigned to a bottom bunk from March 23, 2015, to July 1, 2015. He was inadvertently assigned a top bunk from July 1, 2015, to July 10, 2015, when he suffered a second fall. After the fall, plaintiff was immediately reassigned to a bottom bunk. Plaintiff did not submit an ARP regarding his bunk status until July 15, 2015, five days after the fall and his subsequent return to a bottom bunk assignment.

The named correctional defendants, Tera Reed and Orlando Johnson, were not responsible for plaintiff's bunk assignment and have no recollection of his inquiring about his bunk status prior to the March fall. Even if plaintiff had advised Reed and Johnson of his bottom bunk status, as alleged, in early March, their inquiry regarding same with the traffic department would have been fruitless as traffic had no record of the March 9, 2015, medical order. There is no evidence

28

that any prison staff were aware of plaintiff's medical orders prior to the March fall.  Moreover, plaintiff does not allege that he advised Reed or Johnson in July that he was erroneously assigned to a top bunk.

Plaintiff cannot satisfy the subjective element of an Eighth Amendment claim.  While it is clear that errors were made in regard to plaintiff's bottom bunk assignment, both in March when the initial order was not received by the traffic department and in July when plaintiff was erroneously reassigned to an upper bunk, there is simply no evidence to suggest that the errors were anything more than simple negligence.  Negligence is insufficient to satisfy the subjective element of an Eighth Amendment claim.  *See Felix-Torres v. Graham*, 687 F. Supp. 2d 38, 53 (N.D.N.Y. 2009)

When the error in assignment was brought to the attention of the appropriate staff, plaintiff was moved to the bottom bunk.  There is no indication that anyone intentionally interfered with plaintiff's valid medical order or that any of the named correctional defendants were in fact aware that plaintiff had a valid bottom bunk order.

Additionally, there is no evidence that any of the named defendants, even if aware of the bottom bunk order, drew the inference that failure to comply with same would subject plaintiff to a serious risk of injury.  Even if plaintiff had advised Reed and Johnson that he had a valid bottom bunk order, their failure to personally consult with medical staff regarding same, while perhaps negligent, does not demonstrate deliberate indifference.  *See Pennington v. Taylor*, 343 F. Supp 2d 508, 512-13 (E.D. Va. 2004) (correctional staff's failure to personally consult with medical department regarding inmate's need for a bottom bunk after inmate advised staff of same and where inmate fell injuring himself, "may have been ill-advised, [but] was certainly not reckless.").

As to the correctional defendants, the record evidence cannot support a claim of deliberate indifference to a serious medical need.

**D.      Retaliation**

In order to prevail on a claim of retaliation, plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *Compare Burton v. Livingston*, 791 F.2d 97, 100-01 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim).   "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D.N.C. 1996) (conclusional allegations of retaliation insufficient to state claim), *judgment vacated on other grounds*, 525 U.S. 802 (1998).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Md., Inc. v. Wicomico Cty, Md.*, 999 F.2d 780, 785 (4th Cir. 1993). "In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74

(4th Cir. 1994)).    Plaintiff "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

There is no evidence that plaintiff was denied or delayed medical care or pain medication due to his repeated medical complaints.    To the contrary, as already noted, plaintiff received constitutionally adequate medical care.    His medical care was based on examination of plaintiff by medical staff along with numerous diagnostic studies.    His complaints were regularly evaluated and assessed, and appropriate medications were provided.    There is nothing to support plaintiff's bald allegations of retaliation.

Conclusion

For the reasons stated, the dispositive motions are granted.    Plaintiff's complaint against Oladipo Olaleye and Patience Musong is dismissed.    A separate order shall be entered in accordance with this Memorandum.

Date: August 10, 2016                           _____/s/_____
                                                     James K. Bredar
                                                     United States District Judge